We'll start off with Mr. Simon for 10 minutes. May it please the Court, as Your Honor mentioned, we've submitted five minutes to Disability Rights Texas, the amicus curiae, to address the issue of actual disability. I'm also happy to address that issue as well, in addition to the other issues in the case. The District Court made several fundamental errors in its grant of summary judgment. The first one was its finding that Ms. Trautman's, Heather Trautman's, absences were not protected by the Family Medical Leave Act. There's two fundamental errors in that finding. The first, the certification letter sent to Ms. Trautman, her manager, and the HR representative states that the absences are covered by the Family Medical Leave Act. And the second error is that Ms. Trautman's manager in her deposition admitted that those absences were covered. We took her in her deposition through several of the individual absences, and she admitted during her deposition that that certification letter covered those absences by the Family Medical Leave Act. How many hours of absences are we talking about? The number of hours I'm not quite sure of, it's nine absences altogether, over nine individual days. What was the total number of absences? The total number of absences that were FMLA covered was nine, and those are in the statement. What about the other absences? She had other absences that were not FMLA covered. I believe there were 26 of them altogether. Now, what the district court said was that regarding the FMLA coverage of those nine absences, that they weren't covered by the FMLA, and that even if they were, Ms. Trautman's manager and the HR representative had a good faith belief that those absences were not covered by the FMLA. However, they could not have had a good faith belief in that, first because they both received the certification letter indicating that as of March 20th, those absences were given designated Family Medical Leave Act coverage, and after receiving the certification letter, they never went back to the V01 records, the calendaring system, to look and see whether the designation for coverage had changed or not. So all they knew as of March 20th was that those absences had been designated as being covered by the Family Medical Leave Act. In addition, the HR representative admitted that there was a conflict between the March 20th letter and the V01 records that would have had to have been resolved before Ms. Trautman could have been terminated for those absences as being not FMLA covered. That leads to the district court's next error, which was that Time Warner would have made the same decision anyway, for I think partly the reason that the court was getting to, which is that she had a lot of other absences. No one disputes that Heather Trautman had a lot of absences in January and February of 2015. Some of those absences were FMLA covered. The district court wrongly found that they weren't. Some of them were indisputably not FMLA covered. However, Ms. Trautman's manager, Adrienne Greff, testified that she considered all of those absences when she decided to terminate Heather Trautman. And I asked her at her deposition, did all of the absences listed here in this chart contribute to the excessive absenteeism for which Heather was terminated? And she answered that question in the affirmative. She said, correct. So at this point, there's no way to take apart which of the absences, the FMLA covered absences, the non-FMLA covered absences, could have contributed to the decision to terminate. The manager admits she terminated her for all of those absences, and she can't now go back and say, well, actually, no, it was really only the non-FMLA covered ones. This case is very similar in that respect to the Ion v. Chevron case in which the plaintiff was terminated for FMLA covered absences, but also a litany of other reasons, including having a fit at the clinic where he was getting his documents filled out, taking company property. But the court said because of the inclusion of those FMLA covered absences in the termination notice, there was an issue of fact as to whether the FMLA was violated by including those absences. Let me ask you a question about how these claims relate to one another. Let's say, just for argument's sake, that we affirm the dismissal of the disability discrimination claim because we, contrary to what you said, we think the absences were a legitimate non-protectual reason. Would we still then have to decide the accommodation claim? Explain to me what she would be able to get on the accommodation claim if she can't. If she's no longer employed, they couldn't accommodate her in the future. So what would she be entitled to on the accommodation claim if the dismissal was proper? I know you disagree with the dismissal. First of all, a finding that Time Warner violated the Americans with Disabilities Act by failing to accommodate her. What does that get her? Potentially compensation for mental anguish. Potentially also compensation for lost wages because those absences that she ended up being fired for were absences that she would not have needed to take had she been given the accommodation she requested. So she requested to leave two hours a day earlier than her usual scheduled time, leaving the office to go perform the rest of her work remotely. And then she did that from January to February, got fired for doing that. But had Time Warner properly accommodated her by allowing her to take those absences, she wouldn't have needed to take them at all, and so she wouldn't have been terminated for them. So I think there's also the claim that the denial of reasonable accommodations was a direct cause of her termination and so could entitle her to a claim for lost wages as well. Let me ask you. I know all these claims have all these three-part tests and burden shifting and all that, but I think the Supreme Court said, like any other case, at the end of the day, you look at everything in total and say, is there enough for a jury to say there's some type of violation? I mean, when you look at this holistically, we see a lot of these cases, you know that. It just seems to me Time Warner really gave an incredible number of accommodations. I mean, after her FMLA period expired, they allow her, I think, for about a year to stay home, and they're very sensitive to this child care situation. There's accommodation after accommodation. Now, it eventually comes to a head, and they say, but no more. But, I mean, how do you get over that, the fact that there were so many accommodations? It just seems, at least for most of the time, they were really trying to work with her to accommodate her. It's the new manager. It's always the new manager. The new manager comes in, Adrian Greth, in October of 2015, after Time Warner has very properly accommodated Heather, and Adrian Greth says, oh, you're part of my new team, you can't work from home at all. That's it. End of conversation. And so that's what drives Heather to have to start going through all of these processes with making a formal application for accommodation, which she had never done before, because the company had been fine with how she was handling things previous to that. But once Ms. Greth comes in and says, I'm not accommodating you, you're not going to be able to work from home at all, then Heather has to go through the formal accommodation process. That's denied for reasons that this court has already said are not proper reasons in the Feist case. So that accommodation request is denied. So she goes the second route of trying to get family medical leave to cover those last two hours a day that she needs. Her manager is upset with that, as reflected in the e-mail where her manager says, I think now she's going to start using this time to take two hours off per day, as she had requested in her denied accommodation. The cases give a lot of weight to the employer job requirements. And this lady did work with a team, and I mean, I think the case should say that the uncorroborated testimony of the employee is just not enough to rebut what the employer considers a necessary job requirement. I agree with that. The Cradier case is very clear on that. However, this case is completely different from the Cradier case. First of all, Cradier says that a lawyer working on a team of litigation attorneys who has to be face-to-face in the office with those people all the time has to come to the office. However, Ms. Troutman, she had a job that everybody was remote. All of her meetings that she attended were with people in other states, North Carolina, Delaware. So she worked remotely no matter whether she worked in the office in Austin. She worked with people in the office too, didn't she? She did work with people in the office. And the accommodation she requested was only to work from home for two hours a day. So she would be in the office for six hours per day, working with anybody who needed to work with her, including her manager, and then she could do the administrative tasks, which were the vast majority of her needed tasks, from home. Interestingly, her manager, Ms. Greth, the new manager, she didn't even know what Ms. Troutman's job was. She testified in her deposition, I was pretty unclear around what it was she was supposed to be doing, which is why at one point I asked her to document for me a working task list over the course of a week. The manager didn't define the expectations of the position. The manager didn't know what the job was. So unlike Krijer, where you have a lawyer who has to come in an office and interact with other lawyers all day long, Heather Troutman's manager didn't even know what she did. Heather could have come into the office for six hours a day, sat down with her manager for all of those six hours and explained her job duties and gone over process improvement, but her manager never asked her to do that. Her manager simply took the position, you can't work from home, that's not an allowable accommodation, and I'm not going to go for it. All right, thank you, sir. You have five minutes for rebuttal. We'll now hear from Ms. Davis. Good morning, Your Honors. May it please the Court, my name is Leah Cifuentes Davis and I represent Amicus Disability Rights, Texas. I'll be addressing the statutory mandate to assess an episodic condition in its active state and why there is sufficient evidence in this case that Ms. Troutman has a disability under the active state analysis. The text of the ADA Amendments Act makes it clear that an episodic condition is assessed in its active state. This means that under the plain language, we look at a condition when the limitations are at their most severe, during a flare-up. Applying the plain language to this case and Ms. Troutman's condition, we look at her impairment in its active state, and in its active state, she is substantially limited in the major life activity of concentrating. The District Court gets disability coverage wrong in at least three significant ways. First, the District Court is wrong to state that Ms. Troutman is only limited in driving, and since the Court states that driving is not a major life activity, that she is not covered as a person with a disability. In fact, Ms. Troutman is substantially limited in the major life activity of concentrating, and both she and her doctor agree on that. Her doctor indicated in his statements that she experienced decreased concentration during an episode of her impairment. She expanded on that by explaining that during an episode of her impairment, she experienced nausea, headaches. She had to lie down immediately. She had shortness of breath, tightness all over her body. She also explained that her concentration was diminished for part or all of the day, and it impacted her ability to focus. So we know that in its active state, she was diminished in more than just the ability to drive. She was substantially limited in her ability to concentrate. Didn't the employer offer to let her leave one hour early instead of two hours early, and she never tried that to see whether that would work? I believe her employer did allow her or offer to let her leave one hour early, but unfortunately at 4 p.m. the traffic was still heavy enough to where it would trigger her impairment. Did she try it? I'm not sure if she had attempted it. She knew that the trigger would be driving in heavy traffic, and that's another way, a second way in which the district court got it wrong, in which they conflated the trigger of her disability, in this case driving in heavy traffic, with the major life activity that it limits. As I explained, she's triggered by driving in heavy traffic, but at no point does she argue that that's the major life activity that she's substantially limited in. As I explained earlier, she's substantially limited in the major life activity of concentrating in the active state of her disability. So the district court's logic is akin to saying that a person who has epilepsy, who is triggered by being around strobe lights and thus avoids being around strobe lights, that that person is substantially limited in the major life activity of being around strobe lights. That's clearly not what Ms. Troutman is saying, and we know that many episodic conditions have specific triggers. So Ms. Troutman is not unique in that sense. I think the issue here perhaps is that the trigger in her case, driving in heavy traffic, is a somewhat common occurrence, and it has confused the district court. But if we use the trigger of strobe lights, it maybe provides more instructive examples of how we need to separate the trigger with the major life activity that it substantially limits. So we must not confuse the two. You're arguing she was disabled. There's also an argument in the case about regarded as, and that's usually, you know, if you can't prove disabled, regarded as is a little easier to prove. It's a fallback. In this case, though, would she be regarded as? I mean, is there any evidence that they believe she had this concentration problem? So we believe this is principally an accommodation claim, and to prove accommodation you need to get to the actual disability. There is a regarded as claim as well. On the discrimination? Amicus writes principally on the accommodation claim. I guess you can have. Normally, again, it's easier to prove regarded as, but I guess theoretically could you have a disability where you weren't regarded that way? I guess it seems possible. Yes, it is possible. Here we know that she had an actual disability from the evidence. So it may be true that she was unable to drive during an episode of her condition, but it's not relevant to the discussion of which major life activity her impairment limits. There may have been a lot of tasks that she couldn't do in the active state of her disability, but she does not argue, and nor should she, that they are all major life activities that she's limited in. Third, the district court is wrong to claim that Ms. Troutman can do other activities and thus does not have a disability for the purposes of the ADA Amendments Act. She testified that she was able to take care of her children, run errands, grocery shop, and work in spite of her impairment, but at no point did she testify that she could do those in the active state of her impairment. Additionally, the statute reads that an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability. And as such, we know that individuals, for example, in the epilepsy example that I provided, may be able to do all major life activities so long as their impairment is not in its active state. The ADAAA clearly states that a disability should be assessed in its active state, and in its active state, Ms. Troutman's impairment substantially limits her ability to concentrate. We support appellant in asking this court to reverse and remand this case to the trial court. All right, thank you, Ms. Davis. We'll now hear from Ms. Reinhardt. May it please the Court. My name is Christine Reinhardt, and I represent the appellee, Time Warner Cable, Texas. I want to start out by answering one of the questions Judge Davis posed. How many other hours were non-FMLA related? 190 other hours, and this is during a three-month period. 21 were full-day absences. Ms. Troutman missed the entire month of February, at least almost entirely. This case, at least in Ms. Troutman's view, turns on 8 hours over 8 days. I know now on appeal they claim it's 9 1⁄2 hours over 9 days, but regardless of what you look at, that's less than 5% of her absences in 2015. We think that's what's important in this case in terms of affirming the district court decision, whether it's on the FMLA retaliation claim or on the ADA discriminatory termination claim that they have. With regard to the FMLA retaliation, they hinge their argument on this March 20th letter or email, excuse me, that was sent to Ms. Troutman's manager, Adrienne Greff, that said she's going to have FMLA approved for this wide range of dates. And they claim that at that point in time, Ms. Greff should have gone back and taken out certain absences that were not listed in that March 20th letter, but that Ms. Troutman somehow, unbeknownst to Ms. Greff, was claiming was FMLA related. However, here the deposition testimony, which is what the district court or the magistrate judge in the district court adopted, focused on were the decision makers aware that there was any sort of conflict between this March 20th letter as it's been characterized in the brief. Ms. Harrell testified in the record on 567, were you aware a conflict existed at the time you made the decision to terminate Heather Troutman? I did not. Are you saying you did not know that Heather Troutman had been approved from January 14th through August 27th for five episodes a week lasting up to two hours a day? Not for that frequency and duration. She also testified in her declaration in the record on 366, 367, that HR and management only see what are called V01 records. Those V01 records showed, even as of April of 2017, that the absences, these eight hours or nine and a half hours, whichever way Ms. Troutman wants to characterize it, those hours are still listed in V01 as denied and not being FMLA approved. Counsel, can you help us with the amicus' argument about assessing the disability in its active state and mapping that on to the major life activities that the ADAAA specifically enumerates? So the text of the ADAAA specifically references concentrating as a major life activity. Their argument is that Ms. Troutman is impaired in that major life activity during a flare-up of one of her disability events and that we have to map that, the latter to the former, not as the district court. Or suppose I'm reading the report and recommendation from the magistrate judge, which as I understand it is just adopted by the district court, which is limited simply to driving as a major life activity, which is obviously not enumerated in the list. So help us understand what we're supposed to do. Certainly. I think it's important. And what I think helps in terms of assessing that particular claim is the actual disability claim is only in the context of failure to accommodate. Ms. Troutman has not alleged she's actually disabled, and that's what gives rise to her discriminatory termination claim. I say that because when you look at whether or not someone's disabled under Fifth Circuit case law, you look at whether they're a qualified individual with a disability at the time the adverse decision is made. The accommodation decision was made in December of 2014, actually, in this case, and there are two pieces of evidence that were presented at that time. There was an ADA form that was completed by her physician dated December 12th. It stated what is the description of her functional limitations. She had anxiety and panic attacks related to traffic driving. It asked, it had a whole box of all the ADA major life activities, and all the doctor checked was driving. The doctor did not check concentrating or thinking. When asked how did it impair a major life activity, it simply said inability to drive in heavy traffic. But we don't, the doctor isn't the lawyer in this case, right? So the doctor understands the trigger. That's the driving. I think that sounds undisputed. But the legal question is whether she's impaired in one of these major life activities during the active state of the disability. Isn't that, are you disagreeing with the legal framing in the way they make it? I'm not disagreeing with the legal framework, but I think we have to look at what was the information available at that particular time. The information that they're talking about in terms of additional documentation and evidence in the record is from later in 2015. And so that's why I think we've got to look at what did the doctor say and what did even Ms. Troutman say at the time. What she said at the time, specifically on her form, was I have no limitations for the function of my job duties. She didn't list concentration. There was a later letter from the doctor that talked about, it caused lack of concentration, wasn't there? One of the doctor's notes had mentioned decreased concentration, but it didn't say substantially decreased or how decreased. So you're making an assessment there that decreased concentration automatically rises to the level of substantially limits in a major life activity. There's no further evidence to expound upon that. Isn't there testimony that I saw in the record that she had to lay down and there was all sorts of, more than simply breaks in concentration, right? The instances where she had to lay down was unrelated to her anxiety or panic attacks. It had to do with her pregnant condition back in 2013. It was a completely separate medical issue that gave rise to her need to lay down at the time. But I do think that the court doesn't have to decide was she actually disabled or not. Even if the court assumed so in this case, she wasn't qualified because she couldn't perform the essential functions of the jobs. This is where the Creter case from the Fifth Circuit in 2017 that talks about telework, telework not being a reasonable accommodation, and I know there was some discussion in the appellant's statement or argument to this court about what evidence is there in the record about what her job required. The portion of the testimony that the appellant read to this court is in the context of what Ms. Greth coming on board and wanting to know what was Ms. Troutman doing at home. She was a brand new manager. But there's ample testimony in the record. It's in 232, 234, 245, 246, 435 through 437 where Ms. Greth testifies over and over again that Ms. Troutman is not performing the very first two duties listed on her job description, the first one of which requires documenting processes, which required her to shadow folks that were in the office and to actually sit next to them and look over their shoulder in order to do that aspect. So there's ample testimony and evidence in the record that these were aspects of her job that she wasn't doing, much like in Creter. Creter was similar in terms of when the employee was being, had temporary accommodations, there were aspects of their job that they weren't doing at that time, but that didn't mean that those essential functions could be eliminated on an indefinite or permanent basis, which is exactly what Ms. Troutman asked for here. And as Judge Davis, you mentioned earlier, and I believe Judge Costa as well, Ms. Troutman was offered a modified schedule, and she admitted on, I believe it's page 166 of the record, that she never tried the modified schedule at all. So I think that's really where her failure to accommodate claim, even if we get all the way through the analysis, falls apart. She didn't really engage and attempt the accommodation that was offered to her. Turning back to her other ADA claim as well, in terms of her discriminatory termination, we think here it's much like the FMLA retaliation claim. Even if it's assumed that she was regarded as disabled, she can't demonstrate pretext as a matter of law, nor can she survive a mixed motive defense, which would apply to an ADA case as a motivating factor standard. There's no pretext because unlike a number of the cases the appellant cited in their brief, there's no comparator evidence or evidence of disparate treatment. In fact, the evidence is otherwise. She was treated the same as somebody else who had excessive absences, who didn't have FMLA or ADA reasons for those absences. There's no evidence of failing to follow some sort of policy. In fact, the evidence shows that Time Warner Cable went above and beyond even the non-exempt policy it had, which required termination at 112 hours. She was given 190, as we mentioned earlier. There's also no evidence of derogatory comments, no changing reasons. Given that context, in addition to the 190 other hours, we believe this Court can properly affirm the district court decision. Now, on the FMLA retaliation claim, there is a question that hasn't been answered by the Fifth Circuit in terms of what standard applies. Is it a mixed motive or is it a but-for causation? I don't think this Court needs to answer that question in this case because I don't think Ms. Troutman rises to the level of either. Ms. Troutman, in her argument, attempts to make the FMLA really a strict liability statute, and she forgets the pretext part of it if we're looking at it from a motivating factor standard. She also forgets that with but-for causation, there has to be some other evidence out there. And this is where I think one case, there's two cases that I would cite the Court in support of our position. The first one is Richardson v. Monotronics International. It's from the Fifth Circuit from 2005. This was pre-Nasser and Gross, but the Court applied a mixed motive framework and basically found that because the employee had a sufficient number of occurrences that would otherwise justify termination, then summary judgment was appropriate on the FMLA retaliation claim. The other case I would cite the Court to is Loveland v. Employers Mutual Casualty Company. This is a case where it is very similar to this one factually in the sense that the plaintiff had 18 hours of FMLA leave that the manager mistakenly included on the corrective action form, but there were 93.75 hours of non-FMLA leave. The Eighth Circuit analyzed this particular claim under both the interference and retaliation and said because of the other absences, there was sufficient evidence that the employer would have made the same decision regardless. And that's the very case here. For those reasons, and unless the Court has any other questions, I would urge it to affirm the Eighth District Court decision below. All right. Thank you, Counsel. We'll now hear a rebuttal. As I mentioned earlier, there's no dispute that Heather Troutman missed a lot of work, but one of the cases from this Court is sort of similar to this case. It's Powers v. Woodlands. In that case, there was a mixture of FMLA and non-FMLA leave. The non-FMLA leave was 35 and one-half days, and the Court in that case found that the inclusion of those days plus the FMLA covered days created liability for the company under the Family and Medical Leave Act. So while Ms. Reinhart tries to argue that we're saying that the FMLA is a strict liability statute, in a way it is. If you include days that are FMLA protected in the reason why you terminated the employee, that's going to lead to liability. Ion v. Chevron says essentially the same thing in holding that all of these different reasons that the employer could have used to terminate the plaintiff may be found by a jury to be valid, but there's a fact issue where the employer includes FMLA covered days as justification for the termination decision. Counsel for Time Warner discussed also the Kredger case and the fact that Ms. Troutman's manager wanted Heather to be there to shadow people in the office, and it seemed to indicate that Heather was trying to eliminate functions of her job by teleworking two hours a day. That's not the argument here at all. Heather could have shadowed people in the office for the six hours that she could be there every day. She was not asking to eliminate any of her job functions. She was simply saying that she was requesting that for two hours a day she'd be able to perform the administrative tasks that she had been doing from home for a whole year from that location, and there was no consideration by Time Warner of the possibility for her doing that. The question came up as to whether she tried the two different possible, I wouldn't even really call them accommodations, but the alternate schedule. Heather knew what the traffic was like because she left at different times of day. Her FMLA leave shows that for certain. Some days she would leave an hour early, some days two hours early, some days an hour and a half. She knew what the traffic was like. She testified in her deposition that it gets bad by 3 o'clock. So the 4 o'clock accommodation proposal would not have worked. The other proposal was that she try public transportation, not an accommodation at all, but Heather Trautman lives in Kyle, Texas, which is a tiny town south of Austin, and she testified in her deposition there was no public transportation that she could have used. Time Warner did not engage in any sort of interactive process with Heather to determine whether there was some workable solution to the fact that she needed to be out of the office by 2 o'clock in order to avoid a flare-up of her anxiety. They simply wrote her a letter saying your accommodation request is denied, and it's being denied because it's not related to an essential function of your job. So, again, Time Warner's counsel focuses on the percentage of time that Heather was off from work, FMLA versus non-FMLA, to try to say, oh, we let her have all this time off, and we didn't fire her for that. We loved Ms. Trautman, and she was a wonderful employee. She was simply absent from work too much. There is ample evidence in the record that her manager was upset with her for having started this request for accommodation and taking the time off. The first one of those is that by March, when she received the second written reprimand, Ms. Trautman completely fixed her attendance problems. She had no unexcused, unannounced absences in the month of March. In April, she texts her manager to say, I have no child care today. I'm not really sure what to do. Her manager texts back, take some PTO. You have PTO available, approving the absence. However, the next day, Ms. Trautman learns that she's fired for that very absence. So that's a real, in my opinion, a real bait and switch. And had Ms. Greth told Ms. Trautman you can't take this day off, you're going to be fired if you take this day off, that would be possibly a legitimate reason for letting her go. But Ms. Greth told Ms. Trautman in that text message, you have PTO available, and so Ms. Trautman went ahead and took the day because she thought reasonably that her manager had approved it. Her manager turns around and fires her for it. Finally, there's the email from Ms. Greth to Ms. Harrell telling Ms. Harrell, I think that Heather's going to start now using the FMLA to take these two hours a day off that we had denied her for the accommodation, further evidencing her discriminatory animus toward Ms. Trautman. So with that, we'll be finished. Thank you, judges. All right. Thanks to both sides and to the amicus for the argument. The court is in recess until 9 a.m.